## HORR *et al. v.* BARKER *et al.*

Where the plaintiffs bought a certain amount of flour, being part of a large quantity on storage belonging to the vendor, and the plaintiff did not remove the flour purchased, nor separate it from the remainder; but the vendor subsequently sold the remainder, and more, to other parties, who removed what they purchased, leaving on storage a less amount than had been purchased by plaintiff, which was afterwards attached in a suit against plaintiffs' vendor : *Held*, that the sale and removal of all the flour, except that bought by plaintiff, was a segregation of plaintiffs' flour, vesting in him a clear title at the time of the seizure.

Nor can the claim of a subsequent purchaser of flour from the same vendor, taking an order on the same storekeeper, embarrass the plaintiffs' claim, there being no flour in store to meet the order in favor of such subsequent purchaser.

And where the plaintiffs' action, in such a case, was brought for the value of the flour against another party claiming the flour, who had seized the same, the fact that plaintiff claims a less quantity of flour than he is really entitled to, does not operate otherwise than as a waiver of his claim to such additional quantity.

The doctrine of segregation is not applicable to a man's property alone, in an action against a trespasser, and having claimed damages for a less quantity of flour than was his, it cannot be objected that his action must fail for want of segregation of the flour for which he claims, from that which he does not claim, though it is his.

APPEAL from the District Court of the Twelfth Judicial District.

This was an action for unlawfully taking and detaining 1664 barrels of flour belonging to plaintiff, of which 1340 barrels were Gallego flour, and 324 barrels were Haxall. The action was brought against A. H. Barker and N. C. Paddock, and the members of the firm of Tilden & Little. The suit was discontinued as to the latter. Barker and Paddock plead the general issue.

The agreed statement discloses the following facts : Prior to February 8th, 1854, Messrs. Hussey, Bond & Hale had a large quantity of flour on storage with Tilden & Little. Hussey, Bond & Hale had given to J. R. West several small orders for portions of the flour, which had been taken by West from the warehouse ; on February 8th, Hussey, Bond & Hale gave an order on Tilden & Little for 3276 barrels of Gallego flour and 572 barrels of Haxall flour, to Barker and Paddock, which was on the same day endorsed by the latter to West, who presented the same, and the amount of flour called for by the order was placed to his credit with the warehousemen, and charged to the drawers of the order. Some time prior to May 17th, 1854, West gave to plaintiffs two endorsed receipts of Tilden & Little, calling for 1220 barrels of Gallego flour and 324 barrels of Haxall. The plaintiffs, on or about May 17th, delivered the orders to Tilden & Little, and took their receipts for the flour as stored by plaintiffs.

On September 29th, 1854, the plaintiffs received an order from West

on the warehouse, for 500 barrels of Gallego flour, which they took to the warehousemen, who accepted it for 480 barrels of Gallego and 10 of Haxall. The flour remained in the warehouse undisturbed until October 18th, 1854, when it was taken by the sheriff, under the direction of the defendants Barker and Paddock, but was not removed by them until November 3d, 1854.

Some time in September, 1854, West sent a lot of 200 barrels of Haxall flour, which was not a part of the lot sold by Hussey, Bond & Hale, and which was placed on the top of the large lot of Gallego flour sold by Hussey, Bond & Hale, and separate from all other Haxall flour. This lot was sold to one Piper, who did not remove it, but took a warehouse receipt for it. About a day before October 18th, 1854, Adams, Welch & Co. presented an order, drawn by West on Tilden & Little, for 200 barrels of Gallego flour, which order was accepted by Tilden & Little, and a small quantity delivered by them to Adams, Welch & Co.

Another small order was given by West for a portion of the flour then standing to his credit on the books of Tilden & Little, which closed out all the flour he had in the warehouse.

The flour represented by the receipts of plaintiffs, Adams, Welch & Co., and Piper, was all that remained in the warehouse, of flour stored by West.

On October 17th, Tilden & Little were delivering flour to plaintiffs and Adams, Welch & Co., when Barker and Paddock forbade the delivery of any more, they claiming all the flour stored by Hussey, Bond & Hale, originally transferred to them, and by them endorsed to West. The next day the sheriff seized all the remaining flour, in an action brought by Barker and Paddock against Tilden & Little, claiming the ownership of the flour. Of the 2006 barrels of flour so seized by the sheriff, there were 200 barrels of Haxall flour belonging to Piper, and 1482 barrels Gallego flour represented by plaintiffs' receipt for 1320 barrels, and the balance due on the receipt of Adams, Welch & Co., 162 barrels.; also, 324 barrels of Haxall flour called for by plaintiffs' receipts; but the order of West of September 29th, in favor of plaintiffs, and accepted by Tilden & Little for 500 barrels, being prior to the receipt of Adams, Welch & Co., leaves in the store less than the quantity due to plaintiffs.

The Haxall flour of plaintiffs was mostly in one pile, some fifty barrels being scattered in different parts of the warehouse. There was no other Haxall flour in the warehouse except Piper's lot, which was stored by itself on top of the large pile of Gallego flour. The Gallego flour stood in one lot, except 200 or 300 barrels, which were in different lots.

The plaintiffs proved the value of the flour to be $12 per barrel at the time of the seizure, and proved a demand on Barker and Paddock for the flour, and their refusal to deliver it. Plaintiff also proved that the uniform custom of warehousemen in San Francisco in transferring flour on storage, which was sold but left on storage, was by crediting the purchaser on their books, as was done with respect to plaintiffs' flour,

and that it was not usual to separate the portion sold, from the remainder of the merchandise of the vendor, except it was to be sent away.

The Court below, on motion of the defendants, entered a judgment of non-suit against the plaintiffs, on the ground that they had failed to show any specific actual segregation of the flour claimed by them.

Plaintiffs appealed.

*Williams, Shafter & Park* for Appellants.

Questions of segregation may arise between a vendor and his vendee; a vendee and attaching creditor of the vendor; and between two vendees of the same vendor; and there is no other relation to which the doctrine of segregation has any application.

I. Segregation was not necessary as between Barker and Paddock, and West their vendee.

Barker and Paddock had assigned to West all the Hussey, Bond & Hale flour, (February 8th, 1854,) in the warehouse, and West on that day perfected his title to all of it, by giving notice to the warehousemen and taking their receipt for it.

The flour in controversy was parcel of the lot.

There was no evidence that Barker and Paddock had any other flour in the warehouse on the 8th of February, 1854, and none indeed, that there was any other belonging to third persons.

The result is: Barker and Paddock sold in bulk all the flour in the warehouse to West; or at least sold in bulk all the flour there that belonged to them. Therefore, as the subject matter of the sale exhausted the bulk, segregation was impossible by the conditions.

As between Barker and Paddock and West, nothing remained to be done, neither weighing, measuring, counting, nor payment of purchase money. The delivery to West was complete under the Statute of Frauds, as between parties, as against subsequent vendees, and as against attaching creditors. 2 Vt., 555, Spaulding v. Austin.

If the flour assigned by Barker and Paddock to West, had been destroyed by fire on the evening of February 8th, after the receipts had been issued to West, upon whom would the loss have fallen?

It may be said perhaps, that notwithstanding Barker and Paddock sold to West all their flour in the warehouse, still the title did not pass until that *all* was separated from flour there belonging to third persons.

*First Answer.*—The case does not show that there was any flour there belonging to others.

*Second Answer.*—If it did, it would be of no avail to defendants, for whenever segregation is necessary, when it has been effected, the *residuum* belongs to the vendor, and never to third persons.

If the things sold, are at the time of sale intermingled with other like things belonging to third parties, it is not necessary that there should be a partition between the vendee and such third persons, in order to perfect the title of the vendee as against the vendor.

The result is, that since their assignment to West, Barker and Pad-

dock have been entire strangers to the title, and the case stands as it would if they had never had any connection with it.

II. But it may be said, that as West assigned to the plaintiffs a part only of the flour assigned by Barker and Paddock to him, that part should have been segregated from the bulk, to perfect the title of plaintiffs as against their immediate vendor.

*First Answer.*—Attaching .creditors of West might possibly say this. Subsequent vendees of West, without, notice, very likely would say it. But strangers, like Barker and Paddock, cannot say it, unless West could. Unless West could say, as against the plaintiffs, "It is mine," strangers cannot say, as against them, "It was his." Now, as against West, there was, in view of the custom proved, and in view of the fact that the flour was of uniform appearance and value, a good delivery under the Statute of Frauds.

Story Contracts, § 792; Hollingsworth *v.* Napier, 3 Caines, 185; Wilkes *v.* Ferris, 5 Johns., 333.

And this delivery was good, to all intents, as between the parties, if the Court believe that such was the intention, notwithstanding there was no actual separation. Riddle *v.* Varnum, 20 Pick., 280; Downer *v.* Thompson, 6 Hill, 208.

The custom proved, is conclusive on the question of intent.

If the warehouse had been burned, the loss would have fallen on the plaintiffs. 6 Randolph, 73, Pleasants *v.* Pendleton.

*Second Answer.*—But the case shows, that prior to the seizure on the 18th of October, 1854, a complete segregation had been effected as between West and the plaintiffs.

1. As to the Haxall (324 barrels) called for by plaintiffs' receipts, it was the *residuum* of the Hussey, Bond & Hale lot (572) bearing that brand. And there was no other flour of that brand in the warehouse belonging to third persons, except the 200 barrels belonging to Piper, and they were separated from the 324 belonging to plaintiffs.

Piper could say that the 200 were segregated from the 324; and by parity, the plaintiffs can say, that the 324 were segregated from the 200. But if the 324 were not segregated from Piper's, it is of no moment so long as the 324 *absorbed* the *bulk* belonging to West.

2. As to the Gallego called for by plaintiffs' receipts—1700 barrels: There were but 1482 barrels of that brand in the warehouse at the date of the seizure, and they were the *residuum* of the Hussey, Bond & Hale lot—the original number (3276) had been reduced to 1482 by successive drafts made by West. As that amount was short of the calls of plaintiffs' receipts, there could be no further segregation in the nature of things. It may. be said, however, that although the segregation of the Gallego was complete as between the plaintiffs and West, still 162 barrels of the 1482 belonged to Adams, Welch & Co., and that, as between plaintiffs and them, there had been no segregation.

*First Answer.*—As between plaintiffs and Adams, Welch & Co., the whole 1482 belonged to the plaintiffs. The plaintiffs' title, under the common vendor, West, was the oldest, and had been perfected as

Horr v. Barker.

against subsequent vendees, by notice to the bailees, Tilden & Little. Plaintiffs' title so perfected to 1220 of Gallego, May 17th, 1854, and as to 480 on the 29th of September, 1854—1700 in all.

The title of Adams, Welch & Co., to 162 barrels, was created "on or about the 17th of October." As between the plaintiffs and Adams, Welch & Co., the maxim applies : " *qui prior est in tempore, potior est in jure.*"

*Second Answer.*—But if the foregoing answer is not satisfactory, then we say, that the plaintiffs can recover for 1320 barrels—the remainder given by 162 deducted from 1482 ; notwithstanding the 162 had not been separated from the 1320. As against West, the whole 1482 belonged to plaintiffs and Adams, Welch & Co., in full ownership.

If the plaintiffs cannot sustain this action, then they cannot maintain one against Tilden & Little-; but that an action would lie against them is clear, from 5 Cal., 112, January Term, 1856. And if it would lie against Tilden & Little, then it will lie against defendants ; for they aided, assisted in, and were, in fact, the *causa causans* of the trespass. The sheriff may very well be excused, for he acted officially and without knowledge of the facts. Here he is not sued.

Again, Adams, Welch & Co., and the plaintiffs were in the very act of effecting a separation of their flour, at the time they were intercepted by the defendants. They cannot now take advantage of their own wrong. If there was no segregation, it is attributable to their tortious interference alone.

Again, when the plaintiffs were so intercepted, the flour was in their corporal possession and under their control ; and this possessory title is enough against mere wrong doers.

Our papers call for 1700 Gallego ; the complaint is for 1340 of that brand. The proof shows that 1482 barrels of that brand were converted.

If we had a perfect title to the 1482, we had a like title to every less number contained in it ; and the question comes to this : can we sue for a less number than were converted. We can ; but the residue of the injury will be considered as remitted.

The trespass being entire, there can be but one suit, and the judgment will be a bar as effectually as though the entire tort was comprehended in the issue.

*Janes, Doyle, Barber & Boyd,* for Respondents.

The authorities relied on by the respondents, all of which are cited and most of them commented on in the respondents' brief in Adams *et al. v.* Gorham *et al.* are the following :

1. As to the nature of the action. Roberts *v.* Randall, 3 Sandf., 712 ; Chappel *v.* Skinner. 6 How. Prac. R., 339 ; 2 Greenleaf on Ev., § 638.

2. As to the necessity of proving title to specific property. Rapalje *v.* Mackie, 6 Cowen, 250 ; Lansing *v.* Turner, 2 Johns. R., 16 ; Story on Sales, § 340 ; Austin *v.* Craven, 4 Taunt., 644 ; Austin *v.* Young, 6 Pick., 280 ; Gardiner *v.* Suydam, 3 Seld., 357 ; White *v.* Wilks, 5

Taunt., 175; Burrall v. Jacob, 1 Barb., 167; Jackson v. Hale, 14 How. U. S., 525.

Cases, apparently contra, commented on : Jackson v. Anderson, 4 Taunt., 24; Chapman v. Searle, 3 Pick., 38; Pleasants v. Pendleton, 6 Rand, 473; Gibson v. Stevens, 8 How. U. S., 384.

As to the Haxall flour. The plaintiff did not succeed in proving any identification of 324 specific barrels of Haxall flour, as will appear from an examination of the evidence.

2. The assumption of a sale by Barker & Paddock to West is purely gratuitous. There is no such fact contained in the statement. The proof is that they endorsed the order for the flour to West, but this was done to enable him to sell it on their account, as their agent, and for no other purpose.

The case cited from 2 Vermont does not sustain the plaintiffs' position. That was the case of the bill of sale of a specific chattel, about the identity of which there could be no dispute. The question here is not whether the endorsement and transfer of these delivery orders is not sufficient to pass the title to any specific flour comprised in such order, but whether it is in itself sufficient to give a perfect title to so many specific barrels out of a large number.

3. A mere intention to segregate, unaccompanied by any acts tending to show a legal segregation, cannot operate to effect a transfer of property. There may have been evidence tending to show an intention to segregate, but if it went no further, the plaintiff was properly non-suited.

Whether there is any legal evidence tending to prove an essential fact in the plaintiffs' case, is a question of law, which must always be passed upon by the Court. 1 Greenleaf Ev., § 49.

Undoubtedly, where certain acts are done in reference to property, which may or may not be sufficient to pass the property, according to the intention of the parties, then such intention is a question of fact to be submitted to the jury. But where the acts, whatever was the intention of the parties, are legally ineffectual to pass the property, the intention becomes altogether immaterial.

As to cases referred to by plaintiff :

Hollingsworth v. Napier, 3 Caines, 185, the delivery order of the ten bales was followed by a separation of those bales and a marking of them with the plaintiffs' initials, p. 182. After this the defendant undertook to stop in transitu.

Expressions may be found in the books as in the case just cited, that the delivery of the order is itself a delivery of the goods. This is true where the specific goods exist answering to the terms of the order. But where a separation is necessary to ascertain what are the specific goods referred to, the transfer of the order cannot pass the property.

In Wilkes v. Ferris, 5 Johns., 335, there was no question as to segregation.

In Riddle v. Varnum, 20 Pick., 280, there was no question as to the specific property. The property had been already passed.

In Pleasants *v.* Pendleton, 5 Randolph, 73, the Court went very far out of its way to discuss questions not presented in the record.

The only authority cited in the case is 4 Taunt., 24, which is contrary to the whole series of English authorities, as Austin *v.* Craven, 4 Taunt., 644; White *v.* Wilks, 5 Taunt., 175.

In Downer *v.* Thompson, 6 Hill, 212, the Court put the case on the ground that the defendant, though he had ordered 250 barrels of flour, and was not legally bound to accept the 260 barrels, had waived this objection.    See p. 212.

But whatever be the ground on which this case was decided, it is not authoritative on this Court.    A sounder view of the case will be found in the opinion of the Supreme Court of New York. 2 Hill, 238.

4. On the contrary, the case shows that no such segregation had been made.    The mere giving of an order, and a transfer on the warehousemen's books of an entry of so many barrels from A to B, cannot, in the nature of things, effect a segregation.    Segregation must be effected by some physical act.    It cannot be accomplished by a mental process. There may be a symbolical delivery of specific articles, but there can be no symbolical segregation.    If A had no specific barrels, how could such entry, or assignment of order, vest B with title in so many specific barrels?

5. Piper had made no separation.    He merely held an order for 200 barrels, and we say visited the warehouse, and looked at certain barrels out of a certain 200; still, he made no separation, nor did he agree to take any specific barrels.

6. There was no separation as far as Adams, Welch & Co. were concerned, as this Court has already decided.    January Term, 1856. It is a fallacy to suppose that the plaintiff ever had any title to any specific barrels; he had merely a right of selection, which he had never perfected.

But it will be said, supposing Adams, Welch & Co. had taken all their flour, and that all the other holders of flour, except plaintiffs, had taken theirs, and that the flour then remaining and not subject to any outstanding orders, had been wrongfully removed by defendants, would not there then have been a sufficient segregation, although the plaintiff had not actually segregated or separated the flour? and if there would have been a separation in that case, why not in this ?

The answer is, because different holders of different orders for portions of flour, or any other commodity, to be selected out of a larger mass, from which such portions are as yet undistinguishable, hold such orders under a presumed mutual understanding that each party may go and select his property, and that whatever remains after all but one have made such selection, falls to the lot or share of that one.

The plaintiff says, point 5, " All the Gallego in the warehouse was short of the calls of our title papers."    This is not so.

The plaintiffs claim 1320 barrels Gallego, while the sheriff carried away 1482.

The opinion of the Court was delivered by Mr. Justice HEYDEN-FELDT. Mr. Justice TERRY concurred.

On the 8th February, one West had in store 3276 barrels of Gallego flour, and 572 barrels of Haxall flour.

Subsequently, West sells at two different periods to the plaintiffs, an aggregate of 1700 barrels of the Gallego, and 324 barrels of the Haxall, but,which at the time of the respective sales were not separated from the bulk of West's flour.

Subsequent orders of West in favor of other purchasers, to whom the flour was delivered, reduced the amount in store of the original bulk, before the seizure by the defendants, to 1482 barrels of Gallego, and 324 barrels of Haxall.

There was also in store at the time of the seizure, 200 barrels of Haxall flour, a different and subsequent lot sent there by West, and sold by him to Piper; but this can make no figure in the transaction, because it was separate and apart from the other flour by position in the warehouse, sufficiently to be distinctly known, and specifically delivered. It was not mingled with the other Haxall flour, but was placed upon the top of the large quantity of Gallego flour, from which it was distinguished by its brand, and in that position was seen and accepted by the buyer, pointed out and specified by the warehousemen.

The title therefore of the plaintiffs, was clear to 1700 barrels of Gallego and 324 barrels of Haxall flour, and much less than this amount was in store at the time of the seizure.

Under this state of facts, I do not see how it can be insisted, that the title did not vest absolutely in the plaintiffs for want of segregation. There was in fact, at the time of the alleged taking by the defendants, nothing from which to separate it, because it was mingled with nothing. When it was first purchased by plaintiffs from West, it remained in bulk with West's flour. A separation could then have taken place, either by the plaintiffs removing the part purchased by them, or West removing his remaining portion. This latter was effected by the orders of West to subsequent purchasers, which indeed, it seems extended beyond West's remainder.

No embarrassment can be created by the claim of Adams, Welch & Co. for 162 barrels, because their purchase from West was subsequent to the plaintiffs', and there was no flour in the store to meet the order in their favor.

It was said in the argument that the plaintiffs sue only for 1664 barrels of flour, whereas the sheriff seized 2006 barrels, of which it seems 200 barrels were the specified property of Piper, leaving 1806 barrels of the original lot out of which plaintiffs purchased, and therefore it is urged there is no particular 1660 barrels which are sought to be recovered, and the action must fail for want of segregation. But I have shown that the entire 1806 barrels were the property of the plaintiffs, and indeed less than the amount they had purchased from West; and surely it cannot be argued with any degree of propriety, that the doctrine of segregation is applicable to one man's property alone, and for

the purpose of bringing a suit against a trespasser. If the plaintiffs choose to confine their claim to 1660 barrels, instead of extending it to the whole, it only amounts to a waiver of their right to that which remains unclaimed, and so far operates as a benefit to the defendants.

It results from the examination we have made of the facts of this case, that the plaintiffs are entitled to recover judgment against the defendants for the sum of the price of 1660 barrels of flour, at $12 per barrel, to which the district judge who tried the case upon the facts, may add legal interest from the time of the seizure by way of damages, if in his discretion it is proper to allow it.

Judgment reversed, and cause remanded.